**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Schellenbach and William Ryder, | No. CV-16-00746-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| GoDaddy.com, LLC, | |
| Defendants. | |

Plaintiffs Mark Schellenbach and William Ryder, on behalf of themselves and a proposed class and subclass, bring this action against Defendant GoDaddy.com, LLC. Docs. 1, 33. Plaintiffs move to certify a class and subclass of persons who purchased a "Dedicated Server" from GoDaddy, alleging that GoDaddy failed to disclose that the server was virtualized and not a free-standing machine. Doc. 127 at 10.[1] The motion is fully briefed (Docs. 127, 128, 129), and the Court heard oral argument on June 14, 2017 (Doc. 125). For reasons stated below, the Court will deny class certification.

## I.  Plaintiffs' Proposed Class and Sub-Class.

Plaintiffs seek certification of the following class: "All persons who, between October 23, 2014 and March 18, 2017, purchased GoDaddy Dedicated Servers through the GoDaddy.com website or who purchased Dedicated Servers after viewing the

---

[1] This order cites to page numbers assigned at the top of each page by the Court's ECF system, not to original page numbers.

GoDaddy.com website. Excluded from the Class are purchasers who purchased via the https://www.godaddy.com/servers webpage." Doc. 127 at 6. Plaintiffs further move to certify a California subclass: "All persons in the state of California who, between October 23, 2014 and March 18, 2017, purchased GoDaddy Dedicated Servers through the GoDaddy.com website or who purchased Dedicated Servers after viewing the GoDaddy.com website. Excluded from the Class are purchasers who purchased via the https://www.godaddy.com/servers webpage." *Id.* The definitions of these two classes are identical, except that the subclass includes only California residents. For the sake of simplicity, the Court will refer to both classes as "the class" throughout this order, except where a distinction between the class and subclass is necessary.

**II.     Rule 23 Requirements.**

Under Rule 23(a), a district court may certify a class only if (1) it is so numerous that joinder of all members is impractical, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(1)-(4). The Court must also find that one of the requirements of Rule 23(b) has been met. Plaintiffs rely primarily on Rule 23(b)(3), which requires that questions of law or fact common to the class predominate over questions affecting only individual class members, and that a class action is superior to other available methods for resolving the controversy. Fed. R. Civ. P. 23(b)(3). Plaintiffs also contend, briefly, that the class can be certified under Rule 23(b)(2). The Court must rigorously analyze the proposed class to ensure it comports with Rule 23. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("*Dukes*").

**III.    Individual Issues Prevent Certification Under Rule 23(b)(3).**

GoDaddy opposes class certification under Rule 23(b)(3) on the grounds that (1) the class does not satisfy the commonality, typicality, or adequacy requirements of Rule 23(a); (2) the class is overbroad and unascertainable, and putative class members lack standing to assert a claim; and (3) the class does not satisfy the predominance

requirement of Rule 23(b)(3).  Doc. 128.  The Court finds that the class does not satisfy the predominance requirement of Rule 23(b)(3), and need not address GoDaddy's other arguments.

A class may be certified under Rule 23(b)(3) only if questions of law or fact common to the class will predominate over questions affecting only individual class members.  This predominance inquiry "asks whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) (internal quotation marks and citation omitted).  "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Id.* (quoting *Newberg on Class Actions*, § 4:50 (5th ed. 2012)).  "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (citation omitted).

A.     **The Nature of Plaintiffs' Claims.**

The predominance inquiry begins with the elements of the underlying cause of action.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  Plaintiffs allege violations of the Arizona Consumer Fraud Act ("ACFA"), California Unfair Competition Law ("CUCL"), and California False Advertising Law ("CFAL").  Doc. 127.  Because these are all state law claims, the Court must look to state law to determine whether individual issues will predominate over common issues.  *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010) (holding that the "dispositive issue is thus an issue of Hawaii state law, namely whether Hawaii's Deceptive Practices Act requires a showing of individualized reliance").

The ACFA prohibits fraudulent, deceptive, or misleading conduct in connection with the sale or advertisement of consumer goods and services. A.R.S. § 44-1522(A). To prevail under the ACFA, a plaintiff must establish that (1) the defendant made a misrepresentation or omission in violation of the Act, and (2) the defendant's conduct proximately caused the plaintiff to suffer damages. *Parks v. Macro-Dynamics, Inc.*, 591 P.2d 1005, 1008 (Ariz. Ct. App. 1979). It is not necessary for the plaintiff to show that the defendant made an affirmative misstatement. Material omissions are actionable under the AFCA. *Maurer v. Cerkvenik-Anderson Travel, Inc.*, 890 P.2d 69, 72 (Ariz. Ct. App. 1994).

The CUCL provides civil remedies for unfair competition, which it defines as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. It protects "both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (2011) (citations omitted). The California legislature framed the CUCL's provisions in "'broad, sweeping language.'" *Id.* (citing *Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999)). The CFAL "is equally comprehensive within the narrower field of false and misleading advertising." *Id.* (citations omitted). The CFAL prohibits advertising that "is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. A party wishing to bring a claim under the CUCL or CFAL must show: (1) "a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) [] that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset*, 51 Cal. 4th at 322.

## B. Plaintiffs' Key Omission and the Need for Individual Inquiries.

Plaintiffs' case rests on a single omission. Plaintiffs allege that class members were not told that the Dedicated Servers were virtual – that the servers were not stand-alone boxes, but instead were portions of physical servers shared by others and

- 4 -

"dedicated" to the class member only through virtualization software. This is the material omission Plaintiffs allege under the ACFA and the unfair practice they allege under the CUCL and CFAL. Plaintiffs do not claim that GoDaddy made any other misrepresentations or omissions. Plaintiffs assert that this omission was highly relevant because, according to their expert, virtualized servers function less effectively than stand-alone servers and Plaintiffs therefore paid too much for their Dedicated Servers.

The primary webpage for the Dedicated Servers was www.godaddy.com/pro /dedicated-server. This page will be referred to this order as the "/pro/dedicated-server webpage." GoDaddy concedes that this webpage did not disclose at the beginning of the class period, October 23, 2014, that the Dedicated Servers were virtual. But as of December 15, 2015, it did describe the servers as "Single-Tenant VM." Doc. 127 at 9. GoDaddy's Rule 30(b)(6) witness testified that a person with technical knowledge, such as a web designer or web developer, would know that VM stood for "virtual machine." Doc. 127-1 at 67.

Plaintiffs acknowledge that another GoDaddy webpage – www.godaddy.com /servers – did disclose throughout the class period that the servers were virtualized. This page will be referred to in this order as the "/servers webpage." From the beginning of the class period, it described the Dedicated Server as "Your very own single-tenant *virtual machine*." Doc. 116-2, ¶ 5 (emphasis added). Paul Bindel, a Senior Director of Web Marketing for GoDaddy, submitted a declaration explaining that this webpage was accessible directly from the main GoDaddy webpage from August 2014 to September 2015, and thereafter was accessible through various other GoDaddy webpages, 13 of which are listed in his declaration. *Id.*, ¶ 8. In addition, searches for "GoDaddy" and "server" on widely-used search engines such as Google or Yahoo! would return the /servers webpage as one of the top two non-paid hits. *Id.*, ¶¶ 7-9.

Because the virtual nature of the servers was disclosed on the /servers webpage, Plaintiffs define the class to exclude all persons "who purchased via" the /servers webpage. Doc. 127 at 6. Plaintiffs made clear during oral argument that this exclusion

applies to persons who actually used the /servers webpage as the method for purchasing the Dedicated Servers. The class does not exclude persons who visited the /servers webpage but purchased their Dedicated Server through another method, such as by phone or through another webpage.

Paul Bindel states that the /servers webpage had 373,114 unique visitors between October 1, 2014 and November 4, 2016, a time period that largely overlaps Plaintiffs' proposed class period. Doc. 116-2, ¶ 11; *see also* Doc. 127-8 at 14. The /pro/dedicated-server webpage – from which Plaintiffs allege material information was omitted – received 881,763 unique visitors during the class period. *Id*. at 13. Thus, of the 1,254,877 visits to these two webpages during the relevant time frame, 30% visited the page where the virtualized nature of the Dedicate Servers was clearly disclosed. And if most visitors to the /servers webpage also visited the /pro/dedicated-servers webpage, as is likely, then the percentage would be even higher. If the more conservative 30% figure is applied to the proposed class, which Plaintiffs describe as potentially including 10,039 purchasers of Dedicated Servers (Doc. 127 at 12), then approximately 3,000 class members visited the webpage where the virtual nature of the servers was disclosed. Such class members would not have been exposed to the omission on which Plaintiffs' case rests. And yet because Plaintiffs' class definition excludes only those who actually made their purchases through the /servers webpage, not those who visited it and purchased through other means, a class-member by class-member inquiry would be required to determine which class members actually were subjected to the key omission.

In addition, because the /pro/dedicated server webpage on which Plaintiffs rely included the phrase "Single-Tenant VM" for more than half of the class period, an individualized inquiry would be needed to determine whether class members understood this to mean that they were acquiring a virtualized machine. Plaintiffs argue that the VM acronym was never defined, and note that GoDaddy's Rule 30(b)(6) witness stated that understanding the acronym would require someone with technical knowledge. Doc. 127 at 9. But the class almost certainly includes persons with technical knowledge.

Dedicated Servers were marketed to persons with web-design expertise. The October 23, 2014 press release that launched the Dedicated Server marketing effort (and triggered the start of the class period) referred to the Dedicated Server as an "Advanced Hosting Product[]" and said it was "designed specifically for Web designers and developers." Doc. 109-3 at 2. The Dedicated Servers webpages "specifically catered to tech-savvy developers and designers." *Id.* Given this target market, it is likely that the class includes sophisticated computer users, and an individualized inquiry would be required to determine whether class members had the sophistication to understand that VM meant virtualized machine even if they did not visit the /servers webpage.

And these are not the only ways class members could have learned that the servers were virtualized. Prospective purchasers could also talk with a GoDaddy representative by phone or web chat. GoDaddy provided live customer service representatives 24 hours a day, seven days a week. Doc. 128 at 60, ¶ 5. Evidence in the record shows that GoDaddy representatives did disclose in conversations with customers that Dedicated Servers were virtualized. *Id.* at 82, 94. Evidence also shows that GoDaddy fielded more than 31 million phone calls and participated in over 8 million web chat sessions with customers and potential customers during the class period. *Id.* at 60, ¶ 6. This amounts to an average of 35,556 calls and 8,772 web chats per day. *Id.* Thus, even if a class member did not visit the /servers webpage, an individualized inquiry would be required to determine whether she spoke with a GoDaddy representative and learned that the servers were virtualized.

A GoDaddy manager, Noah Madieros, explained the ways in which potential customers could use the GoDaddy call-in resources:

> A large number of GoDaddy customers . . . utilize the customer service line and chat feature to discuss and/or initiate new purchase transactions. In my experience, it is common for GoDaddy customers to call the customer service line or initiate a chat discussion after reviewing GoDaddy's website, in order to inquire about the specifications of a certain product prior to purchase. It is also common for GoDaddy customers to call the customer service line or initiate a chat discussion to request a consultation

related to the customer's current needs, without having reviewed a specific product offering on GoDaddy's website. It is also my experience that customers will frequently call GoDaddy's customer service line with questions about our server products but will eventually purchase on their own through the website at a later time.

Doc. 128 at 60.

The named Plaintiffs in this case, Mark Schellenbach and William Ryder, provide apt examples of the varied means by which purchasers could acquire Dedicated Servers. Plaintiffs operate SetMySite.com, a business involved in website design and management. *Id.* at 12, 98 (Zechinni Declaration), 170-71 (Schellenbach Declaration); 194-95 (Ryder Declaration). Plaintiffs researched dedicated server options using Google and GoDaddy's website. *Id.* at 177-78, 182-83, 199. Although they viewed webpages on GoDaddy's website before making their purchase, they made the purchase over the phone and discussed the Dedicated Server with a GoDaddy agent during that call. *Id.* at 202.

In short, GoDaddy customers do not have a uniform buying experience when purchasing Dedicate Servers, and many would have been exposed to information beyond that contained in the /pro/dedicated-servers webpage on which Plaintiffs wish to rely. And this does not even account for other means by which class members could have learned that the servers were virtualized, such as word of mouth or trade publications.

Consequently, on the very first element of Plaintiffs' claims – the existence of a material omission – individual issues would predominate if the class were certified. The class therefore cannot be certified under Rule 23(b)(3). *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) (finding class certification inappropriate because plaintiff could not show "that all of the members of his proposed class were exposed to Home Depot's alleged deceptive practices"); *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-cv-04457-SC, 2015 WL 4537957, at *9 (N.D. Cal. July 27, 2015) (denying certification because there was no evidence all class members were exposed to deceptive conduct when claims were based upon individual transactions at the rental counter);

*Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 481 (N.D. Cal. 2014) (rejecting class certification in case involving "Apple's variable conduct in the course of diverse, individualized transactions"); *Mahfood v. QVC, Inc.*, No. SACV 06-0659-AG(ANx), 2008 WL 5381088, at *4-5 (C.D. Cal. Sept. 22, 2008) (denying certification because "there exists far too much variation in individual purchasing experiences").

## C. Materiality and Reliance.

In addition to proving that they were exposed to an omission regarding the virtualized nature of the servers, Plaintiffs must prove that the omission was material and that they relied on it when they made their purchases. The parties disagree on whether these elements of Plaintiffs' claims can be proved class-wide.

Plaintiffs claim that they need not *prove* materiality at the class certification stage. Doc. 129 at 16. The Court agrees. Plaintiffs need not prove any element of their case at this stage, but to obtain class certification under Rule 23(b)(3), Plaintiffs must show that their case is susceptible of class-wide proof – that individual issues will not predominate. The cases cited by Plaintiffs make this clear. *See, e.g.*, *Astiana v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013) (stating that proof of materiality is to be determined by the trier of fact at trial, but that plaintiffs at the class certification stage still must show that materiality is a "common question of fact suitable for treatment in a class action.") (quotation marks and citation omitted).[2]

Because the requirements of materiality and reliance under California law differ somewhat from Arizona law, the Court will address materiality and reliance separately for the subclass and class.

### 1. The Subclass.

As mentioned above, the subclass asserts claims under the CUCL and CFAL. Plaintiffs argue that materiality under these statutes asks whether a "reasonable person"

---

[2] Plaintiffs also suggest that this Court already found that the omission was material when it ruled on GoDaddy's motion to dismiss. Doc. 129 at 16 (citing Doc. 79 at 9). But the question of whether materiality has been adequately alleged (the issue on a Rule 12(b)(6) motion to dismiss) is different from the question of whether materiality can be proved on a common basis for purposes of Rule 23(b)(3).

would attach importance to the misrepresented or omitted fact, and that such a "reasonable person" determination can be made class-wide. This appears to be correct. *See*, *e.g.*, *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK(MRWx), 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014) (CUCL and CFAL permit plaintiffs to show "that Defendants made what a reasonable person would consider a material misrepresentation," which "is an objective, classwide inquiry").

Plaintiffs also argue that reliance can be proved class-wide because they are entitled to a presumption of reliance. The California Supreme Court has suggested that "a presumption, or at least an inference, of reliance arises whenever there is a showing that a misrepresentation was material." *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (quoting *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 976-77 (1997)).[3] But "[a]n inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class." *Davis-Miller v. Auto. Club of S. California*, 201 Cal. App. 4th 106, 125 (Cal. Ct. App. 2011); *see also Knapp v. AT & T Wireless Servs., Inc.*, 195 Cal. App. 4th 932, 942-43 (Cal. Ct. App. 2011); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 973 (Cal. Ct. App. 2009).

As shown above, Plaintiffs cannot show that all subclass members were subjected to a uniform omission. Some visited the /servers webpage where the virtualized nature of the server was clearly disclosed. Others spoke directly with GoDaddy representatives and may have received the same information. Because the nature of the information class members received must be determined on an individual basis, their reliance on that information must also be determined individually. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012) ("we agree with Honda's contention that the

---

[3] On the basis of this holding, some courts have concluded that reasonable reliance is not an element of claims under the CUCL and CFAL. *See Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1125 (C.D. Cal. 2010). The California Court of Appeals, however, has concluded that the decision in *Tobacco II* concerned standing, not the requirements for class certification, and that a class representative's ability to establish reliance on a class-wide basis is relevant to the issue of class certification. *Davis-Miller v. Auto. Club of S. California*, 201 Cal. App. 4th 106, 124 (Cal. Ct. App. 2011).

misrepresentations at issue here do not justify a presumption of reliance. This is so primarily because it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited."); *Stearns v, Ticketmaster Corp*, 655 F.3d 1013, 1022 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) ("An inference of class-wide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class."); *Davis-Miller*, 201 Cal. App. 4th at 125 (same); *see also Plascencia v. Lending 1st Mortg.*, No. C 07-4485 CW, 2011 WL 5914278, at *2 (N.D. Cal. Nov. 28, 2011).

What is more, California law does not "authorize an award . . . on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice." *Cohen*, 178 Cal. App. 4th at 980. Here, many class members will not have been exposed to the material omission, and "if the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (Cal. Ct. App. 2009) (citing *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668 (Cal. App. Ct. 1993)).

The Court concludes that proof of reliance by members of the subclass cannot be made on a common basis. This is an additional reason that the subclass cannot be certified under Rule 23(b)(3).

### 2. The Class.

As noted above, the class asserts claims under the ACFA. Individual issues will predominate in the class for two reasons.

First, for an omission to be actionable under the ACFA, it must be of a "material fact." A.R.S. § 44-1522(A); *Maurer*, 890 P.2d at 72 (ACFA can be violated by "concealment, suppression or omission of any material fact") (quotation marked omitted). Unlike the CUCL and the CFAL, however, materiality under the ACFA does not look to an objective reasonable person. Instead, an omission is material if it is "logically related

to the transaction in which it occurs and rationally significant to the parties in view of the nature and circumstances of the transaction." *Demaree v. Wal-Mart Stores, Inc.*, 511 Fed.Appx. 660, 661 (9th Cir. 2013) (citing *Haisch v. Allstate Ins. Co.*, 5 P.3d 940, 945 (Ariz. Ct. App. 2000)). This test requires an examination of the specific purchase transaction, its nature and circumstances.

Individual issues will predominate when this transaction-specific materiality test is applied. Each purchase of a Dedicated Server must be considered, including an inquiry into whether the class member was exposed to the alleged omission and what other information the class member received about the Dedicated Server. The class member's sophistication will be a relevant component of the nature and circumstances of the transaction. As noted, the primary webpage Plaintiffs rely upon included the description of a "Single-Tenant VM" after December 15, 2015. Doc. 127 at 9. Whether a class member understood this to mean a virtual machine will require an inquiry into the class member's sophistication in computer matters and her familiarity with the acronym VM. In addition, the purpose for which the class member was purchasing the Dedicated Server will be relevant. Some class members may have wanted a virtual machine, or at least not cared whether the server was "dedicated" physically or virtually.

Second, a plaintiff suing under the AFCA must prove reliance. *Parks v. Macro–Dynamics, Inc.*, 591 P.2d 1005, 1008 (Ariz. Ct. App. 1979) (citing *Peery v. Hansen*, 585 P.2d 574, [577-78] (Ariz. Ct. App. 1978)); *see also Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 825-26 (D. Ariz. 2016). This reliance need not be reasonable, *id.*, but even unreasonable reliance must be based on the plaintiff's actual exposure to the omission. If the virtual nature of the servers was not omitted from the information a class member received, then the class member could not have relied on that omission, even unreasonably. *C.f. Peery*, 585 P.2d at 577-78 (in claim under ACFA, "[i]f appellants actually knew that statements in the ad regarding gross sales and net profit were false, then they could not have relied on the truth of the representations and would not have been damaged by them."). Parties that do not actually rely on a false statement or

material omission have no claim under the ACFA.  *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004)  (holding that parties suing on allegedly false appraisal report could not prevail because they "received the appraisal report only after they were already contractually bound to purchase the real estate" and therefore did not rely on the report in purchasing the property).  Thus, Plaintiffs must prove reliance by each class member, and that would require proof that each class member was exposed to the alleged omission.

The Court concludes that proof of materiality and reliance under the ACFA will require class-member by class-member litigation.  Individual issues will predominate, making certification under Rule 23(b)(3) improper.

### D. Foreign Class Members.

Of the approximately 10,000 purchasers of Dedicated Servers, about 5,500 are in the United States.  Doc. 127 at 12.  Plaintiffs' class definition thus includes approximately 4,500 foreign purchasers, and yet Plaintiffs – who have the burden of showing that individual issues will not predominate – have presented no argument or evidence to show that these foreign class members can assert claims under the Arizona or California statutes or would be bound by the judgment of this Court.  Plaintiffs apparently feel a need to define a separate subclass for the approximately 1,700 purchasers in California, but they do not explain why the factors requiring this subclass do not also apply to foreign class members.  Plaintiffs provide no discussion concerning the location of these foreign class members or whether their countries would honor the judgment in this case.  The presence of thousands of foreign class members would likely give rise to numerous individual or small-group issues, defeating class-wide treatment.

### E. Plaintiffs' Arguments.

Plaintiffs make several arguments in support of their claim that the class can be certified under Rule 23(b)(3).  The Court does not find the arguments persuasive.

#### 1. Presence of Non-Injured Class members.

Plaintiffs argue that a small number of putative class members who suffered no injury should not prevent the Court from applying a presumption of reliance or defeat

- 13 -

class certification. Doc. 129 at 14. Plaintiffs contend that "[w]hile GoDaddy surmises that some of those class members may not have been injured, it 'has not shown that the class as a whole was exposed to 'disparate information' from GoDaddy. . . . [and] '[e]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct.'" *Id.* at 14-15 (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136-37 (9th Cir. 2016)).

As discussed above, the evidence shows that almost 400,000 visits to GoDaddy's server-related webpages during the class period included the /servers webpage where the Dedicated Server was described as "Your very own single-tenant virtual machine." Doc. 116-2, ¶ 5. The class definition excludes persons who purchased their Dedicated Server through this webpage, but not persons who visited the webpage and then purchased the server through other means, such as the phone purchase made by the named Plaintiffs. With at least 30% of the server webpage visits being to the very page where the allegedly omitted fact was clearly disclosed, the Court cannot conclude that only a small number of the class members are affected. It appears that almost one-third of the proposed class members were never subjected to allegedly wrongful conduct at issue in this case. This fact alone makes clear that individual inquiries will be required to show that class members received and relied on the alleged omission.

Plaintiff suggested at oral argument that these individual inquiries could be made through a simple two-question questionnaire sent to class members, but the Court is not persuaded that individual issues could be eliminated so easily. The Court could not require GoDaddy to accept a class member's simple assertion in a questionnaire that she did not visit the /servers webpage or receive information regarding the virtual nature of the server through other means. This issue lies at the heart of Plaintiffs' liability claim, and GoDaddy certainly would be entitled to test a class member's assertion on such a central fact, conducting discovery and presenting evidence regarding the webpages visited by the class member and other information the class member received regarding the Dedicated Server before purchase.

Plaintiffs rely on *Torres*, 835 F.3d 1136-37, for the proposition that the presence of non-injured individuals will not defeat class certification. True, *Torres* stated that the possible presence of "some" class members who were not injured is not fatal to a class, but *Torres* specifically recognized that "the existence of large numbers of class members who were never exposed to the challenged conduct to begin with" is a "flaw that may defeat predominance." *Id.* at 1136. That is the situation here. *Torres* cites favorably to the *Berger* and *Mazza* cases cited above, both of which support the decision in this case. *Berger* held that class certification failed because the plaintiffs could not show "that all of the members of his proposed class were exposed to Home Depot's alleged deceptive practices." 741 F.3d at 1069. *Mazza* held that a class could not be certified because the plaintiffs could not show that "all class members were exposed to Honda's misleading statements." *Id.* The same is true here. Plaintiffs cannot show that all members of the proposed class were exposed the GoDaddy's alleged omission of the virtual nature of the server, and it appears that a large percentage were not.

### 2. GoDaddy's Evidence Regarding Phone Communications.

Plaintiffs dispute GoDaddy's evidence that potential customers could learn of the virtual nature of the Dedicated Servers through phone conversations or live chats with GoDaddy representatives. The Court does not agree with Plaintiffs' arguments, but would find that individual issues predominate even if the phone evidence was ignored. The fact that one-third of visits to GoDaddy's server webpages included a page where the virtual nature of the Dedicated Servers was clearly disclosed is enough to show that class-member by class-member inquiries will be needed if this class is certified.

Plaintiffs argue that the Madieros declaration regarding the training of GoDaddy's customer representatives conflicts with his deposition testimony and is unsupported by documentary evidence. Doc. 129 at 7-8, n.7. In the summary judgment context, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (citing *Foster v. Arcata Associates*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied,* 475 U.S.

1048 (1986); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543-44 (9th Cir. 1975)). "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* But this general rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." *Id.* Rather, the rule applies only to "'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment. Therefore, before applying [this] sanction, the district court must make a factual determination that the contradiction was actually a 'sham.'" *Id.* at 266-67.

In his deposition, Mr. Madieros testified that GoDaddy's Customer Care Center ("C3") agents interface with customers, and that anyone wishing to purchase a GoDaddy Dedicated Server would be forwarded to a C3 agent. Doc. 129-2 at 107-08. He further testified that the new hire training manual produced in this litigation was used for all C3 agents. *Id.* at 107. Mr. Madieros acknowledged that the manual makes no reference to virtualization, nor does it define the acronym VM. *Id.* at 108-111. He acknowledged that "the average inbound agent getting a job at GoDaddy for the first time would not necessarily [b]e exposed to the term VM." *Id.* at 112. When asked how many days of training a C3 agent receives, Mr. Madieros responded: "I couldn't say for a standard inbound agent. Our hosting agents go through two weeks." *Id.* at 113. When asked about additional training materials for hosting agents, Mr. Madieros answered that "all of the supplementary material around the HSC 100 test are what they have to pass." *Id.* Mr. Madieros was then asked whether, after completing training, a C3 would immediately begin working as a C3 agent, to which he responded: "As an inbound agent they could." *Id.* Mr. Madieros then clarified what he meant:

> Inbound is one of our departments. They are the ones that are least technically skilled. They clearly still have a lot of material to go through before we let them touch a phone call. After that, they would be specialized in our department, so if they were to apply, either externally or for an internal job opportunity, they have to apply and pass whatever

training documents in their department, and hold the material before they start to enroll.

*Id.* at 114.

Plaintiffs' counsel asked if "C3 call center agents sell GoDaddy dedicated servers[,]" and Mr. Madieros affirmed that "[y]es, they can." *Id.* Shortly thereafter, Plaintiffs' counsel asked Mr. Madieros "[w]hat training and material used by GoDaddy trains GoDaddy employees on the virtualization of GoDaddy dedicated servers?" *Id.* at 115. Mr. Madieros answered that "[t]he training material for our hosting agents, which is all part of the HSC 100 training, spells out that our dedicated servers are Single-Tenant VMs, as opposed to what we would just call a PS" *Id.*

GoDaddy provided a sworn declaration from Mr. Madieros in response to Plaintiffs' class certification motion. Doc. 128 at 58-66. This is the declaration Plaintiffs characterize as a sham and ask the Court to disregard. The declaration describes the structure of GoDaddy's C3 agent system and how some agents receive more specialized training than others:

> 8. Customers who call the customers service telephone number identified on GoDaddy's website are connected to a [C3] agent. Depending on the subject matter of each call, a customer's inquiry may be handled by the first C3 agent with whom the customer is connected, or that agent may re-direct the customer to a C3 agent with more particularized training or experience in dealing with the product or service at issue. Due to the technical nature of GoDaddy's products and services, and the varying sophistication levels of GoDaddy customers, specialized teams of C3 agents handle inquiries and sales related to certain GoDaddy products.

> 9. . . . [I]nquiries and sales related to GoDaddy's Dedicated Server product were generally handled by a specialized team of C3 agents in Hosting Support. It is possible, however, that not every call or chat related to GoDaddy's Dedicated Server product was forwarded to Hosting Support.

> 10. GoDaddy's Hosting Support agents are specifically trained to, among other things, answer questions about GoDaddy's hosting products, including its Dedicated Server product. . . .

> 11. In order to become one of GoDaddy's Hosting Support agents, an individual must participate in a multi-day Hosting Support training program . . . [and] must pass a qualifying exam. . . . [T]he agent is [then] designated as a Tier 1 Hosting Support agent and assigned to the "Inbound" department. . . .

12. At least as early as October 23, 2014, [the beginning of the class period,] the Hosting Support training included a discussion regarding GoDaddy's use of virtualization software in its Dedicated Server Product. Specifically, prospective Hosting Support agents were advised of and expected to know that the Dedicated Server product utilized "Single-Tenant Virtual Machines" or "VMs."

* * *

18. As with all C3 agents, GoDaddy's Hosting Support agents have varying levels of technical knowledge and sophistication. In order to handle more specialized, technically demanding calls, on subject matters that may exceed the scope of the initial Hosting Support, a Hosting Support agent must pass additional training requirements and then apply for such a position. GoDaddy's higher level Hosting Support agents are referred to as Tier 2 and Tier 3 Hosting Support agents.

19. If a Hosting Support agent is unable to answer a customer's question, or needs additional, specialized knowledge to assist a customer, the Hosting Support agent can refer such questions and/or issues to GoDaddy's Tier 2 and Tier 3 Hosting Support agents.

20. I consider the question of whether GoDaddy's Dedicated Server product utilizes virtualization software to be a straightforward issue within the understanding of GoDaddy's entry level Hosting Support agents. . . . [S]ince at least October 23, 2014, the topic has been discussed during GoDaddy's initial Hosting Support training and is otherwise discussed in regular training refreshers, as well as one-on-one coaching sessions as the need arises. My belief is also based on the performance of Hosting Support agents in responding accurately to questions on the issue, as demonstrated by chat transcripts and email communications . . . produced by the Plaintiffs in this case.

21. Specifically, I have reviewed the transcript of the December 10, 2015 online chat between someone logged into the GoDaddy account at issue, identified as "Mark Schellenbach," and a GoDaddy agent identified as Charles Taj Jackson ("Tony"). . . .

22. . . . Tony was a Tier II Hosting Support agent . . . . Tony made the following disclosures:

    (a)    "[A]ll of the resources of the [Dedicated Server] are allocated to you . . . [but] the disk itself would be virtualized."

    (b)    "It is not the same as VPS, in the sense that you would have shared CPU with other users. The build and environment is 'Dedicated' in the resources that you are given. This is done to allow for snapshot backups of the server."

Based on my experience in the management and training of Hosting Support agents, these disclosures are consistent with the type of information provided to Hosting Support agents during their training. This information aligns with the type of information I would expect all GoDaddy Hosting Support agents to provide to customers asking a similar question, regardless of whether the customer asks the question prior to or after purchasing a Dedicated Server.

* * *

24. I have also reviewed certain documents that I understand Plaintiffs produced in this matter, including emails exchanged between an email account for what I understand to be Plaintiffs' business . . . and David Zamora, a GoDaddy small Business consultant, between November 13, 2015, and December 11, 2015. . . . I observer that Mr. Zamora, in an email sent on or about November 13, 2015 . . . disclosed to Plaintiffs that he had spoken to colleagues in "server support," and he had been told "Customer has the core(S) and the system is dedicated to themselves that is what makes it a Dedicated Server. [T]he instance is virtualized." Again, based on my experience in the management and training of GoDaddy's Hosting Support agents, this disclosure is consistent with the type of information that I would expect GoDaddy agents to provide to customers inquiring as to whether GoDaddy's Dedicated Server product utilizes virtualization software.

Doc. 128 at 60-65.

The Madieros deposition testimony states that hosting support agents are C3 agents. *See* Doc. 129-2 at 113. For instance, when asked "[h]ow many days of training do GoDaddy C3 call center agents currently go through," Mr. Madieros responded "I couldn't say for a *standard inbound agent*. Our *hosting agents* go through two weeks." *Id.* One question later, Madieros was asked: "once a C3 call center agent has gone through this [new hire] seven day training . . . do they then start working as a call center agent?" He answered: "As an *inbound* agent they could." *Id.*

Mr. Madieros's declaration clarifies that the term "inbound" agent refers to a department made up of C3 agents with varying specialties – or presumably no specialty if they are new (i.e. "standard inbound agent") – who are the first point of contact for a customer. *See* Doc. 128 at 60-65. A subset of the "inbound" department is comprised of Tier 1 hosting support agents who have completed specialized hosting training. *See id.* at 61, ¶ 11 ( "In order to become one of GoDaddy's Hosting Support agents, an individual must participate in a multi-day Hosting Support training program . . . [and] must pass a qualifying exam. . . . [T]he agent is [then] designated as a Tier 1 Hosting Support agent and assigned to the 'Inbound' department").

With this clarification, the Court does not find that Mr. Madieros's deposition and declaration are contradictory, and certainly not "flatly" contradictory as required by Ninth

Circuit law. *Kennedy*, 952 F.2d at 266. The Court will not disregard the declaration as Plaintiffs request.

Plaintiffs also argue that the declaration is untrustworthy because it is unsupported by any documentation produced in this case. Specifically, Plaintiffs assert that GoDaddy has not disclosed a single example of training material that refers to single-tenant virtual machines despite Mr. Madieros's claim that the training is ongoing. Doc. 129 at 8. Plaintiffs contend that GoDaddy and Mr. Madieros have "change[d] tack" by "now asserting that *some* C3 agents were '*advised of*' [] GoDaddy's virtualization of its dedicated servers." Doc. 129 at 8 (emphasis in original). The Court shares Plaintiffs' concern that GoDaddy has produced no document showing how C3 agents are trained on virtualization, but the record does contain evidence supporting Mr. Madieros's assertion that C3 agents have knowledge that the Dedicated Servers are virtualized and disclose that knowledge to consumers. Plaintiffs themselves were informed on two separate occasions by GoDaddy representatives that their Dedicated Server was virtualized. *See* Doc. 128 at 81-83 (December 10, 2015 live chat with Tier II Hosting Support agent "Tony"), 94 (November 13, 2015 email from GoDaddy Small Business Consultant David Zamora to Plaintiffs). These exchanges occurred after Plaintiffs had purchased their Dedicated Server, but GoDaddy asserts that "Tony" is a C3 agent in the same department as those individuals who would be speaking with potential purchasers of a GoDaddy Dedicated Server. Hearing Transcript at 38:19-21.

In short, although Plaintiffs have raised questions about the evidence GoDaddy has presented, Plaintiffs do not dispute that GoDaddy representatives readily disclosed to Plaintiffs that their server was virtualized, that GoDaddy representatives received literally millions of calls and chats during the class period, and that one of GoDaddy's publicly available server webpages specifically described the Dedicated Server as virtual. Nor have Plaintiffs provided a basis for the Court to ignore the declaration of Mr. Madieros. The Court finds this evidence sufficient to show that an individualized inquiry would be required to determine whether each class member was subjected to the alleged omission,

found it material (in the ACFA claim), and relied upon it. Individual issues will predominate if the class and subclass are certified.[4]

**IV.    The Class Cannot Be Certified Under Rule 23(b)(2).**

Rule 23(b)(2) permits certification of a class if the requirements of Rule 23(a) are satisfied and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs argue that "certification under Rule 23(b)(2) is appropriate as Plaintiffs seek to enjoin GoDaddy from continuing to omit material information regarding the GoDaddy 'Dedicated Servers' that it marketed to the public." Doc. 127 at 14-15. Plaintiffs acknowledge that "GoDaddy currently discloses the use of 'virtual' machines in its Dedicated Servers," but argue that full disclosure "was made only recently and, absent an injunction, GoDaddy could, at any point, revert to its prior descriptions, which omit material information." *Id.* at 10 n.12.

The Court finds a Rule 23(b)(2) class inappropriate. Rule 23(b)(2) authorizes a class in which declaratory or injunctive relief is granted to "the class as a whole," and courts have made clear that it does not apply when class members' claims are inherently individual. As the Supreme Court explained:

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

---

[4] The Rule 23(b)(3) superiority inquiry asks whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement must be met in addition to the predominance requirement. It is not an alternative means for certifying a class. *See id.* (requiring predominance "and" superiority). Thus, if predominance of common issues is not present, superiority cannot save the day.

*Dukes*, 564 U.S. at 360-61 (quotation marks and citations omitted).

Because some class members were not exposed to the alleged omission, they could not seek an injunction against the omission. As a result, an injunction would not provide relief to every class member. Also, because Plaintiffs now know the virtualized nature of the Dedicated Servers, they could not be misled on this fact in the future and therefore cannot show a likelihood of irreparable harm even if GoDaddy were to revert to nondisclosure. Clearly, this case is not suited to injunctive relief.

Finally, Rule 23(b)(2) "'does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.'" *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1186 (9th Cir. 2007), *reversed on other ground*, 564 U.S. 338 (2011) (quoting Fed. R. Civ. P. 23(b)(2), Adv. Comm. Notes to 1966 amend., 39 F.R.D. 69, 102). In this case, where Plaintiffs and the class have purchased their Dedicated Servers and seek to recover monetary damages because they allegedly paid too much, there can be no doubt that the appropriate final relief relates exclusively or predominantly to money damages. Certification of the class under Rule 23(b)(2) is not appropriate.

**IT IS ORDERED** that Plaintiff's motion for class certification (Doc. 109) is **denied**. Within 20 days of this order, the parties shall provide the Court with a joint memorandum setting forth the parties' positions on the future litigation of this action.

Dated this 7th day of July, 2017.

_____
David G. Campbell
United States District Judge