**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Schellenbach, et al., | No. CV16-0746 PHX DGC |
| Plaintiffs, | |
| v. | **ORDER** |
| Godaddy Incorporated, a Delaware corporation. | |
| Defendants. | |

Plaintiffs ask the Court to reconsider its order denying their motion for class certification. Doc. 134. Defendants oppose the motion. Doc. 140. For the reasons that follow, the Court will deny the motion for reconsideration.

**I.     Legal Standard.**

Courts in this district have identified four circumstances where a motion for reconsideration will be granted: (1) the moving party has discovered material differences in fact or law from those presented to the Court at the time of its initial decision, and the party could not previously have known of the factual or legal differences through the exercise of reasonable diligence; (2) material factual events have occurred since the Court's initial decision; (3) there has been a material change in the law since the Court's initial decision; or (4) the moving party makes a convincing showing that the Court failed to consider material facts that were presented to the Court at the time of its initial decision. *See*, *e.g.*, *Motorola, Inc. v. J.B. Rodgers Mech. Contractors, Inc.*, 215 F.R.D.

581, 586 (D. Ariz. 2003). Motions for reconsideration are disfavored, and are not the place for parties to make new arguments not raised in their original briefs. *See Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 925-26 (9th Cir. 1988).

**II. Discussion.**

The Court denied Plaintiffs' motion to certify a proposed class and a California subclass under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure. The primary focus of the parties' briefing and argument was Rule 23(b)(3). The Court found that individual issues would predominate over common issues in the class and subclass, making certification inappropriate under Rule 23(b)(3). Doc. 130 at 2-21. The Court denied certification under Rule 23(b)(2) because the class was not suitable for injunctive relief. *Id.* at 21-22.

**A. Plaintiffs' First Objection.**

Plaintiffs' first argument focuses on the following sentence from section III.B of the Court's order: "Given this target market, it is likely that the class includes sophisticated computer users, and an individualized inquiry would be required to determine whether class members had the sophistication to understand that VM meant virtualized machine even if they did not visit the /servers webpage." Doc. 130 at 7. Plaintiffs argue that this language "sets forth the wrong standard for determining if an advertisement was likely to deceive" under the Arizona Consumer Fraud Act ("ACFA"). Doc. 134 at 4. Plaintiffs argue that Arizona law requires a much lower standard, one looking to "whether the 'least sophisticated consumer' would be misled [by the advertising in question] – not the most sophisticated or target consumer." *Id.* at 5 (citing *Madsen v. W. Am. Mort. Co.*, 694 P.2d 1228, 1232 (Ariz. Ct. App. 1985)).

The Court first notes that Plaintiffs did not make this argument in their motion for class certification or their reply memorandum. Docs. 109, 123. They never cited the *Madsen* case and never argued that the "least sophisticated consumer" standard applied to their ACFA claim. *Id.* As noted above, a motion for reconsideration is not the place for

parties to make arguments not raised in their original briefs. This is a sufficient basis for denying Plaintiffs' first ground for relief.

But the Court also concludes that it would have denied this ground for relief even if it was timely raised. It is true that some Arizona cases have said that the ACFA employs a "least sophisticated consumer" test for determining whether a communication has a tendency to deceive. *Madsen*, the primary case relied on by Plaintiffs, cited a Second Circuit case as support for this standard. 694 P.2d at 1232 (citing *Exposition Press, Inc. v. FTC*, 295 F.2d 869 (2d Cir. 1961)). *Exposition Press*, in turn, was an enforcement action brought by the FTC alleging deceptive advertising. In such an action, the FTC must show that an advertisement has a "tendency to deceive" the public. 295 F.2d at 872. And in making such a showing, the FTC "should look not to the most sophisticated readers but rather to the least." *Id.*

The ACFA has the same public protection purpose. The statute expressly authorizes the Arizona Attorney General to bring enforcement actions against deceptive advertisers. A.R.S. § 44-1524. The ACFA has been used in this manner. *See, e.g., State ex rel. Horne v. Autozone, Inc.*, 258 P.3d 289 (Ariz. Ct. App. 2011), *opinion vacated in part*, 275 P.3d 1278 (Ariz. 2012).

When an agency such as the FTC or the Arizona Attorney General brings an enforcement action alleging deceptive advertising, it makes no sense to require that the agency prove it was misled by the advertising. The action is brought on behalf of consumers generally, not the agency itself. As a result, the agency must show only that the advertising had a "tendency" to mislead the public. *Exposition Press*, 295 F.2d at 872 (FTC must show that the advertising had "the tendency and capacity to deceive a substantial portion of the purchasing public"). Indeed, enforcement agencies need not present evidence from consumers. *Id.* ("Actual consumer testimony is in fact not needed to support an inference of deceptiveness by the [FTC].").

The language relied on by Plaintiffs' motion for reconsideration concerns the tendency of an advertisement to mislead. This is the key language from *Madsen*:

- 3 -

> The term "deceptive" has been interpreted to include representations that have a "tendency and capacity" to convey misleading impressions to consumers even though interpretations that would not be misleading also are possible. *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 (D.C. Cir. 1977); *Goodman v. FTC*, 244 F.2d 584 (9th Cir.1957), *reaffirmed in Simeon Management Corp. v. FTC*, 579 F.2d 1137 (9th Cir.1978). The meaning and impression are to be taken from all that is reasonably implied, not just from what is said, *Spiegel, Inc. v. FTC*, 411 F.2d 481 (7th Cir.1969), and in evaluating the representations, the test is whether the least sophisticated reader would be misled. *Exposition Press, Inc. v. FTC*, 295 F.2d 869 (2d Cir.1961), *cert. denied* 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962).

694 P.2d at 1232. Significantly, every case cited in this language from *Madsen* involves the FTC.

As Plaintiffs correctly note, the "least sophisticated consumer" language has been repeated in Arizona cases addressing private rights of action implied under the ACFA, rather than government enforcement actions. *Madsen* was such a case. *See also Cheatam v. ADT Corp.*, 161 F. Supp. 3d 815, 828 (D. Ariz. 2016) (quoting *Madsen*). But these private-plaintiff cases have not explained how the test is to be applied in a private action brought by an individual claiming to have been misled by the defendants' misrepresentations or omissions.

One thing is clear, however. Arizona cases citing this language do not mean, as Plaintiffs seem to suggest, that a person who was not misled by a misrepresentation or omission because she was sophisticated enough to know the truth can nonetheless assert a claim for misrepresentation or omission under the ACFA because a less sophisticated consumer would have been misled. This is not the law in Arizona. As the Arizona Court of Appeals has explained in applying the ACFA:

> If appellants actually knew that statements in the ad regarding gross sales and net profit were false, then they could not have relied on the truth of the representations and would not have been damaged by them. The court would then have been correct in entering judgment for appellee on the counterclaim since under either theory of fraud, common law or [the ACFA], a private claimant must show reliance.

*Peery v. Hansen*, 585 P.2d 574, 577-78 (Ariz. Ct. App. 1978); *see also Shupe v. Cricket Comm's, Inc.*, No. CV 13-1052, 2014 WL 6983245 at *7 (D. Ariz. Dec. 10, 2014) (applying ACFA and explaining: "Here, as in *Peery*, if Mr. Shupe knew that the 'no contracts' advertisements were false, it is impossible that Mr. Shupe relied on the veracity of those statements and thus Mr. Shupe could not have been damaged by that misrepresentation."); *Gerber v. Wells Fargo Bank, N.A.*, No. 11-01083, 2011 WL 5007921 at *5 (D. Ariz. Oct. 20, 2011) (applying ACFA and explaining: "Accordingly, if Gerber actually knew about Wells Fargo's senior lien, he cannot establish reliance and his cause of action fails."). Thus, if a plaintiff was not misled by a misrepresentation or omission because she knew the truth, she cannot bring a claim under the ACFA.

That principle applies here. If class members knew that the servers they purchased were virtualized because they were sophisticated enough to understand that the acronym "VM" meant "virtualized machine," they were not injured by GoDaddy's alleged failure to disclose the virtualization and they have no claim under the ACFA. As a result, in this case, individualized inquiries will be required to determine which class members saw the "VM" acronym and understood what it meant.

This is the point the Court was making in the portion of the class certification order now challenged by Plaintiffs. The order noted – and Plaintiffs do not dispute – that the first element Plaintiffs must prove under the ACFA is that GoDaddy made a misrepresentation or omission in its representations to Plaintiffs. Doc. 130 at 4 (citing *Parks v. Macro-Dynamics, Inc.*, 591 P.2d 1005, 1008 (Ariz. Ct. App. 1979)). Plaintiffs' ACFA claim rests on one key omission – GoDaddy's alleged failure to disclose that the servers were virtualized. The discussion in section III.B of the order considers whether Plaintiffs can prove this omission with class-wide evidence, or whether individual issues will predominate. Indeed, section III.B is titled "Plaintiffs' Key Omission and the Need for Individual Inquiries." Doc. 130 at 4.

The first portion of section III.B notes that many class members – up to 30% of the class – viewed the "/servers webpage" that clearly disclosed the virtualized nature of

the servers. *Id.* at 4-6. Because these class members were not exposed to Plaintiffs' key omission and therefore could not prevail on the ACFA claim, a class-member by class-member inquiry would be needed to identify them.

The language of the order on which Plaintiffs now focus concerns class members who have no claim because they saw the acronym "VM" on the "/pro/dedicated-server webpage" and were sophisticated enough to understand that it meant "virtualized machine." These class members are not an insignificant percentage of the class. As the Court noted in its order, and Plaintiffs do not dispute, GoDaddy marketed these servers to sophisticated computer users. *Id.* at 6-7. Sophisticated class members who understood the meaning of "VM" were not subjected to Plaintiffs' key omission and cannot establish the first element of an ACFA claim. Individual inquiries would be needed to identify them.

The opening sentence of the next paragraph makes clear that this remains the focus of the Court's discussion in section III.B: "And these are not the only ways class members could have learned that the servers were virtualized." Doc. 130 at 7. The order goes on to note that some class members were told the servers were virtualized in phone conversations with GoDaddy representatives. *Id.*

The conclusion of section III.B is stated this way: "Consequently, on the very first element of Plaintiffs' claims – the existence of a material omission – individual issues would predominate if the class were certified." *Id.* at 8. The Court finds no error in the section III.B discussion or this conclusion.

**B.     Plaintiffs' Second Objection.**

Plaintiffs next argue that the Court erred when it rejected their suggestion that questionnaires could be used to eliminate individual issues. This is the paragraph from the Court's order to which Plaintiffs object:

> Plaintiff suggested at oral argument that these individual inquiries could be made through a simple two-question questionnaire sent to class members, but the Court is not persuaded that individual issues could be eliminated so easily. The Court could not require GoDaddy to accept a class

member's simple assertion in a questionnaire that she did not visit the /servers webpage or receive information regarding the virtual nature of the server through other means. This issue lies at the heart of Plaintiffs' liability claim, and GoDaddy certainly would be entitled to test a class member's assertion on such a central fact, conducting discovery and presenting evidence regarding the webpages visited by the class member and other information the class member received regarding the Dedicated Server before purchase.

Doc. 130 at 14.

Plaintiffs argue that this conclusion overlooks the Ninth Circuit's approval of questionnaires in *Briseno v. ConAgra*, 844 F.3d 1121, 1130 (9th Cir. 2017). But the questionnaires in *Briseno* were to be used in the claims-administration process at the end of a small-claim consumer class action. *Id.* As the court explained: "courts 'can rely, as they have for decades, on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court' to avoid or minimize fraudulent claims." *Id.* (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 667 (7th Cir. 2015)).

Using questionnaires or other standardized forms to pay claims at the end of a class action is a far cry from determining liability at trial. As the Court noted in the language quoted above, the issue of whether class members were exposed to the allegedly fraudulent conduct in this case concerns far more than claims administration – it "lies at the heart of Plaintiffs' liability claim." *Id.* The Court remains unpersuaded that the individualized inquiries needed to resolve this central liability issue can be eliminated through the use of questionnaires.

### C. Plaintiffs' Third Objection.

Plaintiffs argue in their third objection that the Court "erroneously applied the materiality standard under *Mazza v. Am Honda Motor Co* with regard to the presumption of reliance for the California sub-class." Doc. 134 at 9-10. The Court simply disagrees with Plaintiffs' reading of *Mazza*. That case found that "the misrepresentations at issue . . . do not justify a presumption of reliance. This is so primarily because it is likely that

many class members were never exposed to the allegedly misleading advertisements[.]" 666 F.3d at 595. The same is true here – many class members were never exposed to Plaintiffs' key omission. And Plaintiffs' motion for reconsideration makes no mention of the other cases cited by the Court in support of its conclusion that a presumption of reliance would not be appropriate. *See* Doc. 130 at 10-11 (citing *Davis-Miller v. Auto. Club of S. California*, 201 Cal. App. 4th 106, 125 (Cal. Ct. App. 2011); *Knapp v. AT & T Wireless Servs., Inc.*, 195 Cal. App. 4th 932, 942-43 (Cal. Ct. App. 2011); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 973 (Cal. Ct. App. 2009); *Stearns v, Ticketmaster Corp*, 655 F.3d 1013, 1022 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013); *Plascencia v. Lending 1st Mortg.*, No. C 07-4485 CW, 2011 WL 5914278, at *2 (N.D. Cal. Nov. 28, 2011)).

### D. Plaintiffs' Fourth Objection.

Plaintiffs' fourth objection argues that the Court's "findings that 30% of the putative class likely viewed the /servers webpage or could have learned of the virtual nature through word of mouth or trade publications are unsupported by evidence." Doc. 134 at 10-11. The Court relied on evidence from the declaration of Paul Bindel in conducting this analysis. *See* Doc. 130 at 6; Doc. 116-2, ¶ 11.

Plaintiffs argue that there is no basis for concluding that the 30% of visitors who saw the /servers webpages actually purchased the servers at issue in this case, and note that perhaps only 10% made such purchases. The Court noted in its order that the 30% figure for visits to the /servers webpage was conservative because there was likely overlap between the nearly 400,000 people who visited the /servers webpage and the almost 900,000 who visited the /pro/dedicated-server webpage. Doc. 130 at 6. Indeed, if everyone who visited the /servers webpage also visited the /pro/dedicated-serve webpage, then 44% of the total would have seen the /servers webpage where the virtualized nature of the servers was disclosed. The Court chose to use the more conservative 30%. *Id.*

This percentage may be high when applied to the class, because some people who saw the /servers webpage would have purchased through that webpage and would be

excluded from the class definition. But Plaintiffs have the burden of proof on class certification, and they provided no information regarding the number of persons who purchased through the /servers webpage or through other means. Thus, the Court has no basis for discounting the 30% figure. But even if Plaintiffs are correct and the percentage of class members who saw the /servers webpage and purchased the servers at issue in this case is closer to 10% (*see* Doc. 134 at 11), this still amounts to approximately 1,000 of the 10,000 potential class members, and it does not include those who learned of the virtualized nature of the servers through phone conversations with GoDaddy representatives or through the acronym "VM" that appeared on the /pro/dedicated-server webpage. This case still would present the prospect of many class members who knew the servers were virtualized. Individualized inquiries would be required.

Plaintiffs also argue that no evidence has been produced showing that class members learned the virtualized nature of the servers through trade publications or word of mouth. Doc. 134 at 11. True, but the Court stated only that its analysis "does *not account* for other means by which the class could have learned that the servers were virtualized, such as word of mouth or trade publications." Doc. 130 at 8 (emphasis added). The Court did not attempt to quantify those class members, but cited them as one more illustration of the most basic problem with this class – that each class member had a unique collection of information at the point of purchase, a reality that would necessitate individualized inquiries before liability could be established.

### E. Plaintiffs' Fifth Objection.

Plaintiffs' final objection is that the Court failed to narrowly define the class in order to make it acceptable for class certification. Doc. 134 at 12-13. Specifically, Plaintiffs argue that "denial of class certification without attempting to narrow the class to exclude such purchasers was premature. The Ninth Circuit has explained that when overbreadth of a class definition is the issue, 'the better course is not to deny class certification entirely but to amend the class definition as needed to correct the

overbreadth.'" *Id.* at 12 (citing *Torres v. Mercer Canyons, Inc*., 835 F.3d 1125, 1139 (9th Cir. 2016)).

But the Court does not agree that it bore the obligation of properly defining the proposed class. That was Plaintiffs' burden. Plaintiffs proposed the class and subclass after more than a year of litigation and discovery. The Court addressed the class as Plaintiffs presented it.

Plaintiffs contend that their "class definition may be cured by simply excluding from the Class, 'all purchasers who have viewed the '/server' webpage prior to making their purchase," and that, "[i]n doing so, the Plaintiffs' class definition will be precisely limited to only purchasers who were not exposed to the purported discloser on the /server webpage – thus, resolving the Court's concerns regarding the purported inclusion of 'many' class members who were not subject to the key omission." *Id.* at 13.

But even this proposed definition would not account for class members who learned the servers were virtualized through phone conversations with GoDaddy representatives or who saw the servers described as "VM" machines and had the experience to know that this meant virtualized machine. And it would not address the other problems the Court found with class certification. *See* Doc. 130 at 9-13.

What is more, Plaintiffs' proposed new definition might well be an improper fail-safe class. *See Torres*, 835 F.3d at 1138 n.7 ("Indeed, defining the class to include only those individuals who were 'injured' by non-disclosure threatens to create a 'fail safe' class, one that is defined so narrowly as to 'preclude[] membership unless the liability of the defendant is established.'" (citing *Kamar v. RadioShack Corp.*, 375 F. App'x. 734, 736 (9th Cir. 2010))).

**IT IS ORDERED:** Plaintiffs' motion for reconsideration (Doc. 134) is **denied**.

Dated this 29th day of August, 2017.

_____
David G. Campbell
United States District Judge

- 10 -